IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| HUI MALAMA I KOHOLA; CENTER FOR BIOLOGICAL DIVERSITY; and TURTLE ISLAND RESTORATION NETWORK, | ) ) ) ) ) ) | CV. NO. 09-00112 DAE-BMK |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| NATIONAL MARINE FISHERIES SERVICE; UNITED STATES DEPARTMENT OF COMMERCE; and GARY LOCKE, SECRETARY OF THE DEPARTMENT OF COMMERCE, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| HAWAII LONGLINE ASSOCIATION, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |
| _____ | ) | |

ORDER:  (1) DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT; (2) GRANTING FEDERAL DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; AND (3) GRANTING HLA'S MOTION FOR
<u>SUMMARY JUDGMENT</u>

On October 26, 2009, the Court heard Plaintiffs' and Defendants'

Motions for Summary Judgment.  David Henkin, Esq., appeared at the hearing on

behalf of Plaintiffs; Erik Petersen, Trial Attorney, and Edric Ching, Assistant U.S.

Attorney, appeared at the hearing on behalf of Federal Defendants, and Jeffrey

Leppo, Esq., and Steven Otaguro, Esq., appeared at the hearing on behalf of

Defendant Hawaii Longline Association.  After reviewing the motions and the

supporting and opposing memoranda, the Court **DENIES** Plaintiffs' motion for

summary judgment, **GRANTS** Federal Defendants' motion for summary

judgment, and **GRANTS** HLA's motion for summary judgment. (Docs. ## 62, 66,

70.)

<u>BACKGROUND</u>

This matter concerns the Marine Mammal Protection Act ("MMPA"),

16 U.S.C. §§ 1361-1407, and the extent of the federal government's obligations

under that act to protect certain marine mammal populations or species.

The MMPA was established by Congress in 1972 in acknowledgment

that certain marine mammal species or populations are in danger of depletion and

2

that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part."  16 U.S.C. § 1361(2).

Section 118 of the MMPA governs the "incidental taking"[1] of marine mammals in the course of commercial fishing operations.  Id. § 1387(a).  Section 118 places certain requirements on the Secretary of Commerce and grants the Secretary certain discretionary authority.  A primary mechanism through which the Secretary will meet the goals of the MMPA is through implementing "take reduction plans."  Id. § 1387(f).  The immediate goal of a take reduction plan is to "reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock."[2]  Id. § 1387(f)(2).

---

[1] A "take" means to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture or kill any marine mammal."  16 U.S.C. § 1362(13).  The take of a marine mammal is generally prohibited, save for under certain exceptions including "incidental takes."  The MMPA includes a regime to regulate and authorize limited incidental taking in conjunction with commercial fishing operations.  Id. § 1371(a).

[2] The long term goal is to reduce the "incidental mortality or serious injury of marine mammal incidentally taken . . . to insignificant levels approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and existing State or regional fishery

Pursuant to Section 118(f) of the MMPA, the Secretary is <u>required</u> to "develop and implement a take reduction plan designed to assist in the recovery or prevent the depletion of each <u>strategic stock</u> which interacts with a commercial fishery listed [as a Category I or Category II fishery] under subsection (c)(1)(A)(i) or (ii)." <u>Id.</u> § 1387(f)(1) (emphasis added).

The Secretary <u>may</u> develop and implement a take reduction plan "for any <u>other</u> marine mammal stocks which interact with a commercial fishery listed [as a Category I fishery] under subsection (c)(1)(A)(i) . . . [with] a high level of mortality and serious injury across a number of such marine mammal stocks." <u>Id.</u>

The take reduction plan is drafted by a take reduction team that is composed of individuals with expertise in the conservation or biology of the marine mammal or fishery. <u>Id.</u> § 1387(f)(6)(c) & (7)(A). NMFS is required to establish a reduction team no later than 30 days after the Secretary issues a final stock assessment report ("SAR") for the strategic stock. <u>Id.</u> § 1387(f)(3) & (6)(A).

Section 118 also anticipates insufficient funding to develop and implement the take reduction plans for all such stocks, and therefore offers guidelines for prioritization of such stocks. <u>Id.</u> § 1387(f)(3). In the event of insufficient funding, the Secretary is required to give highest priority to the take

management plants." <u>Id.</u> § 1387(f)(2).

reduction plans for species or stocks:  (1) "whose level of incidental mortality and serious injury exceeds the potential biological removal level"; (2) with a small population size; and (3) which are declining most rapidly.  Id. (emphasis added). A "potential biological removal level" is the "maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." Id. § 1362(20).  In other words, if a mammal stock is suffering from a rate of removal that exceeds the potential biological removal level, that stock should be given highest priority.

A "strategic stock," for which the Secretary is required to develop a take reduction plan, is defined as a marine mammal stock for which the level of direct human-caused mortality exceeds the potential biological removal level, or is declining and likely to be listed as a threatened species under the Endangered Species Act, or is already listed as a threatened or endangered species.  Id. § 1362(19).

Hawaii's longline fishery was originally classified in its entirety by NMFS as a Category I commercial fishery in 2004.[3]  69 Fed. Reg. 48,407 (Aug.

---

[3] NMFS places "all U.S. commercial fishers into one of three categories based on the level of incidental serious injury and mortality of marine mammals occurring in each fishery."  69 Fed Reg. 48,407, 48,407 (Aug. 10, 2004).  NMFS

10, 2004).  A Category I fishery is one that experiences frequent incidental mortality and serious injury of marine mammals, responsible for 50% or more of any stock's potential biological removal.  50 C.F.R. § 229.2.  A Category II fishery is one that experiences occasional incidental mortality and serious injury of marine mammals.  Id.  A Category III fishery has a no known incidental mortality of a remote likelihood of mortality and serious injury of marine mammals.[4]  Id.

Subsequent to these classifications, on December 1, 2008, NMFS split the Hawaii longline fishery into a deep-set longline fishery (targeting tuna) and a shallow-set longline fishery (targeting swordfish).  (Doc. # 52 at 18.)  The

---

identifies the humpback whale, false killer whales, Risso's dolphin, Bottlenose dolphin, Short-finned pilot whale, and Sperm whale as species or stocks incidentally injured or killed in Hawaii's longline fishery.  Id. at 48,415 (table 1).

[4] In their Opposition to HLA's counter motion, Plaintiffs' request to strike parts of the declaration of HLA president Sean C. Martin discussing whale interactions with longline vessels.  (Pl.'s Opp'n at 1-3; HLA's Counter Mot. Ex. 6.)  This request was not properly asserted as a motion to strike.  The Court further notes that Martin's declaration was originally submitted on March 30, 2009 as part of HLA's motion to intervene in this action.  (Doc. # 8.)  It is not considered by this Court as a substantive argument in support of HLA's counter motion. Generally, motions to strike are not favored by courts in the absence of prejudice.  Wailua Ass'n v. Aetna Casualty & Surety Co., 183 F.R.D. 550, 553, 555 (D. Haw. 1998).  This Court cannot identify any prejudice in HLA attaching as an exhibit a declaration that has already been submitted to the Court.  For these reasons, Plaintiffs' request is denied.

shallow-set fishery has been classified as Category II, and the deep-set longline

fishery is classified as Category I.  (Id.)

The recent stock assessment report ("SAR")[5] issued by NMFS on

April 29, 2009 also split the Hawaii false killer whale population into two stocks –

the "Hawaii Insular Stock" and the "Hawaii Pelagic Stock."  The Pelagic Stock is

identified as a strategic stock.  (Doc. # 52 at 18-19.)  The Insular Stock has not

been labeled a strategic stock.

On August 10, 2009, Plaintiffs Hui Malama I Kohola, Center for

Biological Diversity, and Turtle Island Restoration Network (collectively,

"Plaintiffs")[6] filed their Amended Complaint, seeking declaratory judgment and

injunctive relief against National Marine Fisheries Service ("NMFS"), the United

States Department of Commerce, and Secretary of Commerce Gary F. Locke

---

[5]  SARs are required under Section 117 of the MMPA, and include *inter alia* minimum population estimates, estimate of the human-caused mortality and serious injury to the stock, and estimate of the potential biological removal level of the stock.  16 U.S.C. § 1386.  (Pl.'s Mot. at 6.)

[6]  Hui Malama I Kohola is a Hawaii unincorporated association, which seeks to "promote sound management of ocean resources."  (Doc. # 52 at 5.)  Center for Biological Diversity is a non-profit corporation dedicated to preserving, protecting, and restoring biodiversity, native species, ecosystems, and public lands.  (Id. at 6.) Turtle Island Restoration Network is a non-profit corporation dedicated to the study, protection, enhancement, conservation, and preservation of the marine environment and its wildlife.  (Id. at 7.)

(collectively, "Federal Defendants") and against Defendant-Intervenor Hawaii

Longline Association ("HLA").  (Doc. # 52.)  Specifically, Plaintiffs claim that

Federal Defendants have:  (1) failed to convene a take reduction team in violation

of Section 118(f) of the MMPA and the Administrative Procedure Act ("APA"), 5

U.S.C. § 706, (Count I); failed to develop and implement a take reduction plan for

Hawaii's false killer whales as required by Section 118(f) of the MMPA and the

APA (Count II); and failed to determine whether to prioritize take reduction

planning for false killer whales pursuant to the Section 118(f)(3) statutory factors

in violation of the MMPA and the APA (Count III).  (Doc. # 52 at 21-23.)

On September 8, 2009, Plaintiffs filed their motion for summary

judgment.  (Doc. # 62.)  On October 2, 2009, HLA filed a counter motion for

summary judgment, combined with its Opposition to Plaintiffs' motion for

summary judgment.  (Doc. # 66.)  On October 15, 2009, Plaintiffs filed their

opposition to HLA's counter motion, combined with Plaintiffs' reply in support of

their original motion for summary judgment.  (Doc. # 75.)  HLA's reply in support

of its counter motion was filed on October 20, 2009.  (Doc. # 79.)

Federal Defendants filed their counter motion for summary judgment,

combined with their opposition to Plaintiffs' motion for summary judgment, on

October 2, 2009.  (Doc. # 70.)  On October 15, 2009, Plaintiffs filed their

opposition to Federal Defendants' counter motion, combined with their reply in support of their original motion for summary judgment.  (Doc. # 73.)  Federal Defendants' reply in support of their counter motion was filed on October 20, 2009.  (Doc. # 78.)

<u>STANDARD OF REVIEW</u>

Rule 56 requires summary judgment to be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  "A material fact is one which may affect the outcome of the litigation."  <u>Commodity Futures Trading Comm'n v. Savage</u>, 611 F.2d 270, 282 (9th Cir. 1979).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  <u>See</u> <u>id.</u> at 323.  In other words, the moving party satisfies its burden under Rule 56 by demonstrating "that there is an absence of evidence to support the non-moving

party's case." <u>Id.</u> at 325. A moving party without the ultimate burden of persuasion at trial -- usually, but not always, the defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "'must set forth specific facts showing that there is a genuine issue for trial'" and may not rely on the mere allegations in the pleadings. <u>Porter</u>, 419 F.3d at 891 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers. <u>S. Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003). "[A]t least some 'significant probative evidence'" must be produced. <u>T.W. Elec. Serv.</u>, 809 F.2d at 630 (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968)). "A scintilla of evidence or evidence

that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.  The issue of material fact need not be "'resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing version of the truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank, 391 U.S. at 288-89).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id.  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

DISCUSSION

I.   Take Reduction Plan (Count II)

Plaintiffs seek summary judgment that NMFS's failure to establish a take reduction plan for Hawaii's false killer whales violates Section 118(f) of the MMPA, and constitutes unlawfully withheld agency action not in accordance with the law and without observance of procedure required by law in violation of Section 706 of the APA.  See 16 U.S.C. § 1387(f); 5 U.S.C. §§ 706(1), (2)(A), (2)(D).

It is undisputed that NMFS has not established a reduction team or a reduction plan for the false killer whales found in Hawaiian waters. (Pl.'s Mot. at 15; Fed Def.'s Counter Mot. at 4.)

As noted above, the 2008 SAR (finalized on April 29, 2009), split the false killer whales in Hawaiian waters into two stocks:  the Hawaii Insular Stock and the Hawaii Pelagic Stock.[7]  The 2008 SAR identified the Hawaii Pelagic Stock

---

[7]  The parties also do not dispute that, prior to the 2008 SAR and before the false killer whales were split into two stocks, NMFS had concluded that the single stock was a "strategic stock."  Nor do the parties dispute that the Hawaii longline fishery was originally classified as Category I, and subsequently divided into deep-set and shallow-set longline fisheries, classified as Category I and Category II respectively.  (Pl.'s CSOF ¶¶ 1, 2, 4, 6; Fed. Def.'s CSOF ¶¶ 1, 2, 4, 6; HLA's CSOF ¶¶ 1, 4.)

HLA argues that the SARs conducted prior to the 2008 SAR are immaterial to this action.  (HLA's Counter Mot. at 32-33; HLA's CSOF ¶ 4.)  To the extent

as a "strategic stock." (Pl.'s CSOF Ex. 2. at 2560; Fed. Def.'s CSOF ¶ 8; HLA's

CSOF ¶ 8.)  The Pelagic Stock has been classified a strategic stock because the rate

of mortality and serious injury to the stock is estimated at 5.7 animals per year,

which exceeds the potential biological removal level of 2.2 animals per year.  (Pl.'s

Mot. at 15; Pl.'s CSOF ¶ 8; Fed. Def.'s CSOF ¶ 8; HLA's CSOF ¶ 8.)

      NMFS spent over $51 million on take reduction efforts for marine

mammals other than Hawaii's false killer whales from Fiscal Year 2005 to Fiscal

Year 2009.  (Pl.'s CSOF ¶ 12; Fed. Def.'s CSOF ¶ 12; HLA's CSOF ¶ 12.)

---

that Plaintiffs' motion is requesting prospective relief in the form of a take reduction team, take reduction plan, and determination of priorities, the Court agrees that the SARs predating the 2008 SAR have been superceded by the 2008 SAR.  The 2008 SAR divides the killer whale stock into two different stocks, and explicitly identifies only one stock as a "strategic stock," which entails an appreciably different legal analysis for each of the two newly-classified stocks. This Court could not logically order Federal Defendants to form a reduction team based on the 2004 SAR and at the same time the 2008 SAR.

     Plaintiffs properly asserted standing based on the 2007 SAR.  And, as all parties are generally in agreement as to the substantive legal issues in the case, i.e., whether NMFS has complied with its statutory mandate and whether NMFS has enough funding to form a reduction team and reduction plan, the Court is able to provide effective relief to either party even if the 2008 SAR alone is considered. As Plaintiffs point out in their Opposition to HLA's Counter Motion, even after the 2008 SAR, "the same marine mammals swimming in the same waters are being hooked and entangled by the same longlines."  (PL.'s Opp'n to HLA Counter Mot. at 9.)

     In any event, this Court's analysis as to Federal Defendants' agency action and legal obligations is the same, irrespective of whether this Court begins its analysis with the pre-2008 SARs or the 2008 SAR.

Development and implementation of a reduction plan for the Hawaii Pelagic Stock is estimated to cost $975,000.  (Lecky Pl.'s CSOF Decl. ¶ 9; Gold Fed. Def.'s CSOF Decl. ¶ 3; HLA's CSOF ¶ 10.)

With these undisputed facts in mind, the Court must next address which, if any, of the three parties are entitled to judgment as a matter of law as to Count II.

A.    <u>Statutory Requirements of the MMPA</u>

The parties dispute whether NMFS has sufficient funding and Federal Defendants are legally obligated to establish the take reduction plan.

As discussed above, Section 118 of the MMPA requires the Secretary to develop a take reduction plan for each strategic stock in a Category I or Category II fishery.  16 U.S.C. § 1387(f)(1).  The Secretary has the option of developing a take reduction plan for other mammal stocks in a Category I fishery. <u>Id.</u>  Under these sections of the statute, and in light of the 2008 SAR, Federal Defendants would be required to develop a take reduction plan for the Hawaii Pelagic Stock, but not for the Hawaii Insular Stock.  Even if the two stocks were still combined as one, however, the analysis of NMFS's "lack of funding" argument is the same.

In the event there are insufficient funds to develop a reduction plan for these stocks, Federal Defendants are required to prioritize these stocks.  Id. § 1387(f)(3).  The Court notes that this section does not state that certain stocks must ultimately be actually funded, only that the Secretary is required to determine which stocks are highest priority for this limited funding.  Implicit in this language, therefore, is the possibility that some of the strategic stocks may not receive any funding.

B.      Federal Defendants' Implementation of the MMPA Requirements

Federal Defendants have concluded that they were not allocated sufficient funding to develop a reduction plan for Hawaii's false killer whales.

This Court's review of Federal Defendants' actions is limited by the standards set in the APA.  See City of Sausalito v. O'Neill, 386 F.3d 1186, 1205 (9th Cir. 2004).  An agency's "failure to act," such as NMFS's alleged failure to develop a reduction plan, is reviewable only if the agency failed to take a specific action that was required by law.  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004).  The only agency action that can be compelled is action legally required and "unlawfully withheld."  Id. at 63; 5 U.S.C. § 706(1).

In this case, development of a reduction plan for the Hawaii Pelagic stock is required by law unless there is a lack of funding.  This implicates a

15

discretionary function by the agency, as a lack of funding necessarily involves the agency's discretion to allocate funding to certain programs.  Federal Defendants' conclusion that there was a lack of funding to develop a plan is subject to the APA's arbitrary, capricious, or abuse of discretion standard under Section 706 of the APA.  See 5 U.S.C. § 706(2)(A).

Plaintiffs contend that there is sufficient funding to develop and implement a reduction plan for Hawaii's false killer whales.  (Pl.'s Mot. at 17.)  As evidence, Plaintiffs submit exhibits documenting the budget summary for the years following the 2004 SAR.  (Pl.'s CSOF ¶ 11.)  The mere existence of these budgets, however, does not demonstrate that those budgets were enough to fund development of a reduction plan for Hawaii's false killer whales.  Federal Defendants present the declaration of Helen Golde, Deputy Director of the Office of Protected Resources at NMFS, who states:  "Given NMFS's many other obligations and commitments, to date NMFS has lacked sufficient funding to establish a [take reduction team] and develop and implement a [take reduction plan] for the Hawaii Pelagic Stock of false killer whales."  (Golde Fed. Def.'s Mot. Decl. ¶ 4.)  Moreover, the fact that NMFS has spent over $51 million on take reduction efforts for other marine mammals is not, in itself, evidence that NMFS has funds free to spend on the Hawaii false killer whale stock.

16

Federal Defendants argue that Plaintiffs are attempting to "set agency priorities that are left to agency discretion."  (Fed. Def.'s Mot. at 12-13.)  Indeed, "[t]he agency is in a unique . . . position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."  In re Barr Laboratories, Inc., 930 F.2d 72, 76 (D.C. Cir. 1991).  The parameter's of a court's review in this regard are narrow.  This Court has "no basis for reordering agency priorities."  Id.

At the hearing on this matter, Plaintiffs' counsel emphasized the argument raised in its briefing that funds are "available" for a take reduction team or plan because the funds given to NMFS by Congress are a lump-sum not earmarked for a particular purpose.  (Pl.'s Opp'n to Fed. Def.'s Counter Mot. at 1-2.)  Therefore, asserts Plaintiffs, because funds are "available," NMFS has abused its discretion by not funding the false killer whale reduction team and plan.

The arguments made by counsel focused primarily on two issues:  (1) the existence of reduction teams and plans for stocks other than the Hawaii Pelagic false killer whale stock; and (2) to what other "non-mandatory" activities does NMFS allocate its funding to the detriment of the false killer whales.

Federal Defendants' counsel explained at the hearing that the reason reduction teams and plans exist for other species is because false killer whales have

17

been ranked a high priority for the next take reduction team and plan – they were not the absolute first priority among all stocks.  The existing reduction teams and plans are in place for either other high priority stocks or stocks for which Federal Defendants were obligated either by law or settlement to allocate funds.  Plaintiffs' counsel disputed some part of Federal Defendants' characterization of its legal obligations but did not dispute the general statement that the false killer whales are identified as top priority for the next team and plan.

Federal Defendants acknowledged at the hearing that the majority of the funding NMFS receives is allocated toward its "observer programs."  Counsel described these observer programs as the "lifeblood" of the agency's work, an integral part of the agency's existence, and argues the money put toward these programs cannot be considered available for other programs.  Subtracting the money put toward observer programs, approximately $2 million over the course of five fiscal years is left to go toward all other activities including gear research and existing take reduction teams.  The remainder available to put toward a new reduction team and plan for the false killer whales is much less than what is needed.

These observer programs are also mandated by the MMPA and are at least as entitled to available funds as are the take reduction plans.  The Secretary

"shall allocate observers among commercial fisheries in accordance with the highest priority," beginning with commercial fisheries that have incidental mortality or serious injury of endangered or threatened species and second for commercial fisheries with incidental mortality and serious injury of strategic stocks.  16 U.S.C. § 1387(d)(4) (emphasis added).  To determine the distribution of observers among commercial fisheries, these factors may be considered:  obtaining statistically reliable information; fair and equitable assignment among fisheries and vessels; no overly burdensome observer coverage on any individual vessel; and the need to minimize costs and avoid duplication.  Id. § 1387(d)(3).  Unlike the take reduction plan requirement, this observer program subsection does not have an "insufficient funding" provision.  In other words, whereas Congress expressly alleviated NMFS's obligation to create take reduction plans in the absence of funding, Congress did not expressly alleviate NMFS's obligation to conduct monitoring in the absence of funding.  Therefore, Plaintiffs' argument that NMFS abuses its discretion by not putting some of the observer program funds toward the false killer whale reduction plan is unavailing.

Moreover, the Ninth Circuit has acknowledged the discretion a court must give to an agency's allocation of lump-sum funds:

> [A]n agency's allocation of funds from a lump-sum appropriation
> requires a complicated balancing of a number of factors which are
> peculiarly within its expertise: whether its resources are best spent on
> one program or another; whether it is likely to succeed in fulfilling its
> statutory mandate; whether a particular program best fits the agency's
> overall policies; and, indeed whether the agency has enough resources
> to fund a program at all.

Serrato v. Clark, 486 F.3d 560, 568 (9th Cir. 2007) (quoting Lincoln v. Vigil, 508

U.S. 182, 193 (1993)).  And contrary to Plaintiffs' assertions, the MMPA does not

set a firm deadline to create a reduction plan, insofar as it permits NMFS to not

develop a reduction plan at all if there is insufficient funds.  Plaintiffs' argument is

therefore somewhat circular, because a deadline for creating a take reduction team

and a take reduction plan is only triggered if there is sufficient funding to develop

that plan.

The evidence before this Court shows that Federal Defendants could

reasonably conclude that NMFS received less funding for the applicable fiscal year

than is required to develop a reduction plan for the false killer whales.  The

Omnibus Appropriations Act of 2009 included an appropriation of "$306,000 for

NMFS to implement existing [reduction plans] and investigate the need for a

[reduction plan] for the Hawaii Pelagic Stock of false killer whales."  (Lecky Pl.'s

Mot. Decl. ¶ 8.)  This means that NMFS was appropriated $306,000 to cover both

existing plans and an additional plan for the Hawaii Pelagic Stock.[8]  This number is less than half of the undisputed full cost of $975,000 to develop and implement a reduction plan for the Hawaii Pelagic Stock alone.[9]  (Lecky Pl.'s CSOF Decl. ¶ 9; Gold Fed. Def.'s CSOF Decl. ¶ 3; HLA's CSOF ¶ 10.)

Lecky, Director of the Office of Protected Resources at NMFS, presents data showing NMFS's spending in fiscal years 2005-2009 on the Atlantic Large Whale, the Bottlenose Dolphin, the Harbor Porpoise, the Pacific Offshore Cetacean, Atlantic Trawl Gear, and the Pelagic Longline.  (Lecky Pl.'s Mot. Decl. ¶¶ 4-5.)  In his declaration, Lecky states that NMFS "did not have sufficient funding to support" any additional reduction teams, and "lacked sufficient funding to develop and implement a [take reduction plan] for the Hawaiian Stock of false killer whales."  (Id. ¶¶ 5-6.)

A court must not make "fine-grained judgments" of an agency's analysis, instead, a court's role is "simply to ensure that [an agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'"  Lands

---

[8]  Of this amount, Federal Defendants aver that NMFS allocated $56,000 for monitoring the effectiveness of the Atlantic Large Whale reduction plan, $100,000 for the Bottlenose Dolphin and Pelagic Longline reduction teams, and $150,000 for the Hawaii Pelagic Stock reduction plan.  (Fed. Def.'s CSOF ¶ 9.)

[9]  The full cost of $975,000 is also greater than the $450,000 which Plaintiffs allege NMFS had said it would spend.  (Pl.'s Mot. at 18 n.16.)

Council v. McNair, 537 F.3d 981, 993 (9th Cir. 2008) (citing March v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)).  Allocation of funds requires a delicate analysis of factors within the agency's expertise, and the MMPA makes allowance for the realities of insufficient funding to agencies.

The Court acknowledges that the statistics presented to the Court indicate that Hawaii's false killer whales are facing a high level of mortality and serious injury.  This threat is not taken lightly.  The Court is constrained, however, by legal precedent and the record before it, and the Court cannot conclude as a matter of law that Federal Defendants have violated their statutory mandate.  The federal government must strike a balance among the many competing causes to which it may allocate its funding.  If there is fault here, the fault may lay with Congress for not allocating NMFS sufficient funds to cover all its needs.

Accordingly, Plaintiffs' motion for summary judgment as to Count II is DENIED, and Federal Defendants' and HLA's motions for summary judgment as to Count II are GRANTED.

II.     Take Reduction Team (Count I)

Plaintiffs assert that NMFS violated the MMPA and the APA by failing to establish a take reduction team to begin the take reduction process.  Most recently, accordingly to Plaintiffs, Federal Defendants have failed to establish a

reduction team within 30 days of the issuance of the 2008 SAR on April 29, 2009. (Pl.'s Mot. at 2.)

As evidence of the need for expeditious action, Plaintiffs submit the December 2008 Government Accountability Office report, which concluded that "the false killer whale is the only marine mammal for which incidental take by commercial fisheries is above its maximum removal level that is not covered by a take reduction team."  (Id. at 3.)

NMFS is required to establish a reduction team no later than 30 days after the Secretary issues a final SAR for the strategic stock.  16 U.S.C. § 1387(f)(3) & (6)(A).  When the human-caused mortality and serious injury from a strategic stock, such as the Hawaii Pelagic Stock, is greater than the potential biological removal level, a take reduction team is required to submit a draft take reduction plan within 6 months.  Id. § 1387(f)(7)(A)(i).  The Secretary is then required to publish the proposed plan in the Federal Register within 60 days.  Id. § 1387(f)(7)(B)(i).  Within 60 days after the close of the comment period, the Secretary is required to issue a final take reduction plan.  Id. § 1387(f)(7)(c).

This requirement to establish a reduction team must be read in conjunction with the MMPA's contemplation of insufficient funding.  See id.

§ 1387(f)(3).  Creation of a reduction team sets in motion a series of mandatory events leading to creation of a reduction plan, but this reduction plan is itself not required if there is insufficient funding.  Establishment of the reduction team sets off a cascade of events leading to the plan.  As Federal Defendants note, the establishment of a reduction team defines when the reduction plan must be produced.  (Fed. Def.'s Counter Mot. at 19.)  Surely the exception for insufficient funding applies as much to the reduction team as it does to the reduction plan.  If a reduction team is always required irregardless of availability of funds, then in essence a reduction plan is always required irregardless of availability of funds.  To accept the latter interpretation would render the insufficient funds clause meaningless.  See Nat'l Wildlife Fed'n v. NMFS, 524 F.3d 917, 932 (9th Cir. 2008) ("[T]extual interpretations that give no significance to portions of the text are disfavored.").  There is no evidence before the Court that the MMPA imposes a duty to create a reduction team separate from the obligation to develop a reduction plan.  Even assuming a separate obligation, the insufficient funding analysis discussed above would apply to the reduction team as well.

Because NMFS is not required by law to create the reduction team when there is insufficient funding to develop a reduction plan, this Court may not

compel NMFS to form a reduction team in this case.[10]  See Norton, 542 U.S. at 64; 5 U.S.C. § 706(1).

Accordingly, Plaintiffs' motion for summary judgment as to Count I is DENIED, and Federal Defendants' and HLA's motions for summary judgment as to Count I are GRANTED.

III.   Prioritization of Take Reduction Efforts (Count III)

In the alternative, Plaintiffs seek summary judgment that, even if there were insufficient funding available, NMFS has never applied the statutorily mandated factors set forth in Section 118(f)(3).  (Pl.'s Mot. at 2.)  These factors require that the Secretary "gives highest priority to the development and implementation of take reduction plans for . . . stocks":  (1) "whose level of incidental mortality and serious injury exceeds the potential for biological removal"; (2) "that have a small population size"; and (3) "which are declining most rapidly."  16 U.S.C. § 1387(f)(3).

The method by which Federal Defendants are to rank priorities is left to their discretion, and as such this Court's review is limited the standard set by section 706(2) of the APA as discussed above.  "[W]hen an agency is compelled

---

[10]  Because this Court has concluded that NMFS has no duty to establish a reduction team, this Court need not address the parties' arguments as to whether Federal Defendants unreasonably delayed establishment of a reduction team.

. . . to act . . . but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." Norton, 542 U.S. at 65.  The Court therefore cannot substitute its judgment for the agency and compel the agency to set a specific priority.  The Court can, however, review the agency's actions to ensure that the agency examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts and the choice.  See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983.)

Plaintiffs assert that, since the 2004 SAR, NMFS has never analyzed whether the statutory factors warrant prioritizing take reduction efforts for false killer whales over other eligible stocks.  (Pl.'s Mot. at 2, 20; Pl.'s CSOF ¶ 13.) Plaintiffs emphasize the scarcity of evidence documenting any deliberation or analysis by NMFS.

Federal Defendants counter that NMFS "regularly conducts the prioritization analysis."  (Fed. Def.'s Counter Mot. at 24.)  NMFS Deputy Director Golde asserts in her deposition that the analysis is conducted regularly, with the most recent analysis conducted in March 2009.  (Golde Fed. Def.'s Counter Mot. Decl. ¶¶ 10-11.)  Federal Defendants admit that, until March 2009, NMFS had not formally documented their analyses.  (Id. ¶ 11.)  Federal Defendants correctly note

26

that the statute does not require them to create a written report of their analyses. See 16 U.S.C. § 1367(f)(3).

Federal Defendants present a 32-page memorandum in the administrative record titled "NMFS's Priorities for Convening Take Reduction Teams," dated March 10, 2009.  This memorandum outlines the process that NMFS will go through to prioritize stocks, based on the Section 118(f)(3) factors. This memo ranks the Hawaii Pelagic Stock as the first "high" priority.  (Pl.'s CSOF Ex. 6 at 6, 27.)

Plaintiffs reject this prioritization document as inadequate, and criticize the fact that it "ignored completely the other fisheries that already have TRTs and/or TRPs and, thus failed to consider whether . . . some of the millions of dollars spent annually on take reduction in those fisheries" should be put towards the false killer whales in Hawaiian waters.  (Pl.'s Mot. at 21-22.)  Plaintiffs are correct that in the ranking process, NMFS identified all the fisheries for which no reduction team or plan currently exists and then determined which of those are highest priority for a new reduction team.  According to Plaintiffs, if Federal Defendants had compared the risk of the false killer whales to the risk born by other stocks that already have TRTs, the false killer whales would have been found more in need of the limited funds.  (Id. at 23-24.)

27

This Court's review of the statute does not reveal a requirement that when NMFS evaluates fisheries, it must start over from the beginning every time and include in these rankings (and therefore potentially de-fund) fisheries for which there are already reduction teams.  If NMFS were to include stocks already with a reduction plan in this ranking each time NMFS ranked, NMFS might be placed in the untenable position of de-funding a stock it had earlier determined to be high priority.

As such, NMFS has submitted evidence to this Court that it has engaged in a ranking analysis.  Although the scarcity of evidence in this case is less than desirable, the Court does have before it a ranking memorandum.  To the extent that Plaintiffs argue that NMFS did not perform its job adequately, Plaintiff does not show that NMFS was arbitrary or capricious in its rankings conducted for the March 10, 2009 report.  Furthermore, it is perplexing to this Court why Plaintiffs would dispute the March 10, 2009 report, as it officially ranks the Hawaii Pelagic false killer whale stock as the first high priority for a new reduction team.

The relief sought by Plaintiffs as to NMFS's ranking is equitable in nature.  Plaintiffs seek injunctive relief to ensure that NMFS prioritized the false killer whale stock pursuant to the statutory factors, and NMFS has done so in its March 10, 2009 report.

## CONCLUSION

For the reasons stated above, the Court DENIES Plaintiffs' motion for summary judgment, GRANTS Federal Defendants' motion for summary judgment, and GRANTS HLA's motion for summary judgment.

The Clerk of the Court is hereby directed to enter judgment in favor of Federal Defendants and HLA.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 30, 2009.



_____
David Alan Ezra
United States District Judge


Hui Malama I Kohola, et al. v. National Marine Fisheries Service, et al., CV No. 09-00112 DAE-BMK; ORDER:  (1) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; (2) GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (3) GRANTING HLA'S MOTION FOR SUMMARY JUDGMENT